# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
ALAN L. HAYWARD,        \*
       \*    No. 16-1539V
       Petitioner,    \*    Special Master Christian J. Moran
       \*
v.        \*    Filed: October 9, 2020
       \*
SECRETARY OF HEALTH    \*
AND HUMAN SERVICES,    \*    Finding of Facts
       \*
       Respondent.    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Richard H. Moeller, Moore, Heffernan, et al., Sioux City, IA, for petitioner;
Dhairya D. Jani, United States Dep't of Justice, Washington, DC, for respondent.

## UNPUBLISHED RULING FINDING FACTS[1]

Alan Hayward alleges that an influenza vaccination he received on November 20, 2013, caused him to develop Parsonage-Turner syndrome, also known as brachial neuritis, leading to left-hand weakness. Pet'r's Br., filed Mar. 19, 2019, at 8, 13.[2] The parties dispute when Mr. Hayward began to experience left shoulder pain and weakness.

A hearing was held via video conferencing on May 21, 2020, to resolve the factual dispute regarding onset. See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006) (noting the efficacy of holding a hearing in cases where testimony and medical records conflict). Mr. Hayward testified at the hearing along with Rebecca Van Slyke, who lives with Mr. Hayward. The undersigned has considered all the evidence including the testimony from that hearing. The evidence presented below is the evidence most relevant to determining onset.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website (https://www.uscfc.uscourts.gov/aggregator/sources/7). This posting will make the decision accessible to anyone via the internet. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

[2] Mr. Hayward initially defined his injury as the limited function and use of his left hand. Pet., filed Nov. 17, 2016, at 3. Mr. Hayward testified that his left hand is "severely limited" and his left arm is "very functional." Tr. 26-27.

Pursuant to well-established standards for determining when events did or did not happen, see Sanchez v. Sec'y of Health & Human Servs., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), mot. for rev. denied, 142 Fed. Cl. 247, 251-52 (2019), vacated on other grounds and remanded, 809 Fed. Appx. 843 (Fed. Cir. Apr. 7, 2020), the undersigned finds how the evidence preponderates.  In setting forth the findings, the undersigned also cites to the primary evidence that is the basis for the finding.  The undersigned recognizes that not all evidence is entirely consistent with these findings.  See Doe 11 v. Sec'y of Health & Human Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010) (ruling that the special master's fact-finding was not arbitrary despite some contrary evidence).  Indeed, it is the presence of inconsistent evidence that dictated a proceeding to resolve factual disputes.

The undersigned resolves the disputed factual issues as follows:  Mr. Hayward's mild left shoulder pain and left-hand weakness began on December 21, 2013.

## Summary of Evidence

1. During the relevant time, Mr. Hayward was primarily self-employed as a carpenter/contractor but also earned income from a side videography business, which occupied less than ten percent of Mr. Hayward's working hours.  Tr. 21-23.  In October and November 2013, Mr. Hayward worked on the exterior of his sister's lake house for various time periods (hours worked on 13 different dates: 4, 1.5, 3.5, 5, 1, 3, 5, 3, 2.5, 3.5, 4.5, 1, and 2.5).  Exhibit 170 at 1.

2. Both before and after the vaccination, Mr. Hayward primarily treated with a chiropractor, Dr. Scott Nelson, for acute injuries and chronic issues.  Mr. Hayward had treated with Dr. Nelson since 2005/2006 and had treated with another chiropractor before then.  Tr. 129, 181.  In 2012, Mr. Hayward had 15 chiropractic appointments and had new injuries throughout the year.  Exhibit 14 at 9-45.  For a majority of these injuries, Mr. Hayward sought chiropractic treatment within a few days, if not the following day, and returned for continued treatment when an injury persisted.  Exhibit 14 at 9 (new injury from past two days), 11 (new injury from yesterday), 14 (new injury from previous week), 18 (new injury from yesterday), 18-24 (four treatments in eight days), 26-39 (six treatments in twenty days).  In 2013 before the vaccination, Mr. Hayward sought chiropractic treatment eight times for back pain ranging in severity from 2 to 7 of 10(10 being the most severe pain).  Exhibit 14 at 46-60.  At a July 15, 2013 appointment, Mr. Hayward came in for clicking and popping in his left knee but also reported lower and mid-back pain as 4 of 10.  Exhibit 14 at 56.  At an October 29, 2013 appointment, Dr. Nelson recorded Mr. Hayward's mid-back and neck pain as 4 of 10 and lower-back pain as 5 of 10 from raking outside.  Exhibit 14 at 60.

3. Mr. Hayward received a flu vaccine in his left shoulder on November 20, 2013.  Exhibit 1 at 3.  Soon after the vaccination, Mr. Hayward experienced some "very minor discomfort" at the injection site, which then dissipated later that night or the next day.  Exhibit 6 (affidavit signed Nov. 14, 2016) ¶ 6.  Exhibit 169 (affidavit signed Oct. 24, 2019) ¶ 27; Tr. 39.

4. On November 22, 2013, Mr. Hayward video-recorded an auction. Exhibit 176 at 2. Mr. Hayward testified that he did not have any shoulder pain or hand weakness at that time. Tr. 135.

5. In his first affidavit, Mr. Hayward attested that pain in his left shoulder and intermittent pain in the left side of his neck started "later." Exhibit 6 ¶ 7. In his most recent affidavit, Mr. Hayward stated that a dull ache began in the upper front of his left shoulder four or five days after the vaccination. Exhibit 169 ¶ 28. Mr. Hayward testified that his aching front left shoulder pain began "several days" after the vaccination and then after the "next few to several days" the pain proceeded to the back of the left shoulder. Tr. 40-43. Ms. Van Slyke testified that Mr. Hayward was experiencing shoulder pain before Thanksgiving, November 28, 2013. Tr. 172-73, 183.

6. In his first affidavit, Mr. Hayward stated that "within about a week," the pain in his left shoulder and neck were lessening, but he started losing strength in left hand. Exhibit 6 ¶ 8. In his most recent affidavit, Mr. Hayward stated that "approximately two weeks after the injection" (or "approximately the first week of December"), his shoulder pain was beginning to dissipate, and he started to notice weakness in his left hand. Exhibit 169 ¶ 33. Mr. Hayward testified that his shoulder pain began to lessen five to eight days after the vaccination and he then began to feel a loss of strength in his left hand at the "very end of November and by the beginning of December." Tr. 44.

7. Mr. Hayward attributed an atypical gap in the work on his sister's house from November 19, 2013, to December 2, 2013 (12-day gap that includes Thanksgiving) to the shoulder pain. Exhibit 169 ¶ 32; Tr. 52-53. Mr. Hayward noted that he usually would try to minimize the amount of work done outside during this time of the year. Tr. 52. According to Mr. Hayward's pre-vaccination work records, he sometimes worked consecutive days but also had a 5-day gap and an 11-day gap in his work on his sister's house. Exhibit 170 at 1.

8. On December 6, 2013, Mr. Hayward video-recorded an auction. Exhibit 176 at 3. While he did not remember this videography job, Mr. Hayward reasoned that his shoulder was not bad enough to cancel the job. Tr. 55.

9. Mr. Hayward returned to work on his sister's house on Friday, December 12, 2013. Exhibit 170 at 2. At that time, he testified that he could not pick up a nail out of his apron due to his left-hand weakness. Tr. 60. During the following week, Mr. Hayward worked at his sister's house for three days. Exhibit 170 at 2. Mr. Hayward testified that around this time, he did not have much pain remaining in his left shoulder. Tr. 61.

10. After the vaccination, Mr. Hayward first saw his chiropractor, Dr. Nelson, on December 23, 2013. Dr. Nelson recorded Mr. Hayward's neck pain radiating to left shoulder as 5 of 10 and mid-back pain as 5 of 10. Dr. Nelson quoted Mr. Hayward saying that, "I was shoveling when I pulled my back out of place. I feel most of the

3

pain in my upper left back and into my neck. I thought the pain would go away … but it has been present for the past two days straight." Exhibit 14 at 63. For his chiropractor appointments, Mr. Hayward stated he did not remember the individual visits but agreed with the accuracy of the records. Tr. 64-66, 73, 85. Mr. Hayward agreed that Dr. Nelson was a good listener. Tr. 130. Mr. Hayward characterized his neck pain as a separate pain from his shoulder pain and attributed the neck pain to moving ladders around but did not know when the neck pain began. Tr. 66-68.

11. A few days later, Dr. Nelson recorded that "[Mr. Hayward has] been feeling the same since [his] last visit. [He has] no strength in [his] left hand which is making it really hard to do any of [his] daily activities or work. [He has] not used any ice on [his] neck or shoulder because [he is] not having much pain just irritation due to not being able to use [his] hand or [his] arm." Exhibit 14 at 63.

12. On December 31, 2013, Mr. Hayward saw his primary care provider, Dr. Patrick Dunlay, who recorded that "[Mr. Hayward] states that in approximately the last 10 days [December 21, 2013] he has lost about 80-99% grip strength in the left hand, as well as fine motor control. He does not remember a particular event after this started." Exhibit 2 at 59. In Dr. Dunlay's assessment and plan he determined that "Because of acute onset of this finding I felt it was important that we have him see a neurologist as soon as possible." Id. Mr. Hayward disputed how Dr. Dunlay presented the onset of his left-hand weakness (December 21, 2013), and asserted that this date was when his left hand became the weakest, the nadir. Tr. 75-76. Mr. Hayward agreed that Dr. Dunlay is a good doctor and a very good listener. Tr. 129.

13. Due to Dr. Dunlay's concerns, Mr. Hayward saw Dr. Alirexa Yarahmadi, a neurologist, on the same day. Dr. Yarahmadi recorded that Mr. Hayward "started noticing new onset left hand weakness approximately 10 days ago," and "Ten days ago he noticed sudden weakness in his left hand only." Exhibit 2 at 60-61. Dr. Yarahmadi assessed Mr. Hayward as having "Chronic left upper extremity weakness/atrophy related to remote cervical radiculopathy," "chronic left shoulder pain," and offered a differential diagnosis of cervical radiculopathy, carpal tunnel syndrome, and stroke. Id. Mr. Hayward disputed the 10 days prior onset recorded by Dr. Yarahmadi but acknowledged the accuracy of other parts of the appointment record. Tr. 77-78, 91-92.

14. At a January 2, 2014 appointment, Dr. Nelson recorded that Mr. Hayward had pain radiating from his neck to left shoulder (4 of 10), that he felt a little better, and his grip strength was a little better. Exhibit 4 at 66.

15. On January 22, 2014, Dr. David Beck, a neurologist, recorded that Mr. Hayward "woke up in December [2013] with burning pain in his neck going into the left arm and into his hand. His pain is resolved but he notices a very weak grip on the left and some weakness of dorsiflexion of his hand. He may be getting a little better since this started." Exhibit 13 at 9. Mr. Hayward testified that the statement about when his pain began was not accurate. Tr. 152-53.

4

16. From the record of a January 23, 2014 physical therapy appointment, the therapist noted Mr. Hayward "had a month of hand weakness" and the onset/exacerbation date of his hand weakness was specified as December 20, 2013.  Exhibit 3 at 218.

17. On February 12, 2014, Dr. Beck recorded that "[Mr. Hayward] now is almost 3 months out with increasing weakness in his left hand."  Exhibit 13 at 7.

18. On June 17, 2014, Mr. Hayward travelled to the Mayo Clinic to see Dr. Mohamed Kazamel and Dr. Jennifer Tracy.  Dr. Kazamel recorded that "in December 2013 [Mr. Hayward] started to develop two types of pain.  The first pain is dull aching in the back of the left shoulder with no specific radiation.  It was from 2 to 3/10 in severity and now it became 1/10 in severity with no specific precipitating or relieving factor.  He has another type of pain which is sharp, shooting, electrical-like which is mainly on the back of the neck on the left side."  Exhibit 9 at 43-45.  Mr. Hayward agreed with the accuracy of this medical record.  Tr. 103-05.  Dr. Tracy recorded that "[Mr. Hayward] was well up until December 2013, when he developed a couple of different types of symptoms.  One was a dull, achy pain involving his left posterior shoulder which was a 2/10 to 3/10, without any real radiating symptoms down the arm. This gradually decreased to about a 1/10.  Over a similar time period, he has had some sharp, shooting electric pains in the back of his neck, without radiation. This can be precipitated by looking to the right.  Gradually over this same time period, he has evolved left upper extremity weakness and atrophy, with significant weakness particularly of his hand and fingers."  Exhibit 9 at 38.  Mr. Hayward agreed with the accuracy of this medical record.  Tr. 108.

19. On the next day at the Mayo Clinic, Mr. Hayward saw Dr. Robert Spinner.  Dr. Spinner referred to Dr. Tracy's history but also summarized that "[Mr. Hayward] gradually developed left hand weakness and atrophy particularly affecting his hand and fingers beginning in December [2013].  He had mild posterior shoulder pain at the start, which gradually improved. He had an immunization one month earlier."  Exhibit 9 at 33.  Mr. Hayward generally endorsed the accuracy of this record but questioned the description of his shoulder pain as "mild" while acknowledging that the appointment "was a long time ago and I don't recall specifically what I said to [Dr. Spinner] at that point in time."  Tr. 110-11.

The remaining records do not inform the issue of onset.

Findings of Facts

After considering the witnesses' testimony as well as the documentary evidence, the undersigned finds that **Mr. Hayward's mild left shoulder pain and left-hand weakness began on December 21, 2013.**  The primary reasons supporting this finding are as follows:

20. Mr. Hayward alleges the onset of severe left shoulder pain shortly after the November 20, 2013 vaccination.  Exhibit 6 ¶ 7 (affidavit signed November 14, 2016:

5

"develop[ed] pain in my left shoulder"); exhibit 17 ¶ 7 (affidavit signed January 4, 2017: "initially suffer[ed] pain in my left shoulder. The pain gradually became quite severe"); exhibit 169 (affidavit signed October 24, 2019: "I began to feel pain in my left shoulder … a dull, aching pain"); Tr. 67 ("a serious deep, dull ache that was in the front and back shoulders), 111 ("I had some fairly severe posterior shoulder pain at the start."). Mr. Hayward's post-vaccination medical records do not document the onset of severe shoulder pain shortly after the vaccination that he alleges.

  a. At his first post-vaccination chiropractic appointment on December 23, 2013, Mr. Hayward reported neck pain radiating to his shoulder. He attributed the shoulder pain to pulling his back while shoveling. Exhibit 14 at 62. Mr. Hayward stated that "I thought the pain would go away … but it has been present for the past two days straight," which would place this neck/shoulder pain beginning around December 21, 2013. Exhibit 14 at 62.
  b. At his next chiropractic appointment on December 26, 2013, Mr. Hayward noted that "[he had] been feeling the same since [his] last visit … I have not used any ice on my neck or shoulder because I am not having much pain." Exhibit 14 at 63.
  c. On the next day, Mr. Hayward complained to his chiropractor that "My shoulder, arm, and hand are still really bothering me." Exhibit 14 at 64.
  d. On December 31, 2013, Dr. Dunlay recorded that Mr. Hayward had "a little bit of tightness in the left neck area, which is chronic," that there were "no other pain issues or questions or concerns," and mainly focused on Mr. Hayward's left-hand weakness. Exhibit 2 at 59. Later that day, aside from the left-hand weakness concerns, Dr. Yarahmadi recorded that Mr. Hayward had "aching in his shoulder, left more than right" and assessed that aching as "chronic left shoulder pain." Exhibit 2 at 60-61.
  e. On January 22, 2014, Dr. David Beck, a neurologist, recorded that Mr. Hayward "woke up in December [2013] with burning pain in his neck going into the left arm and into his hand. His pain is resolved." Exhibit 13 at 9.
  f. During his Mayo Clinic consultations on June 17, 2014, Mr. Hayward reported to two different neurologists that in December 2013 he developed a "dull aching in the back of the left shoulder" with a 2-3 of 10 initial severity that decreased to a 1 of 10 severity and had a sharp, shooting pain in the left side of his neck with a severity of 8-9 of 10. Exhibit 9 at 43. On the next day, a neurosurgeon characterized Mr. Hayward's initial shoulder pain as "mild." Exhibit 9 at 33.

Mr. Hayward's medical records provide insight on how he reacts to injuries and severe pain. As documented in his chiropractic records, Mr. Hayward lived with some level of chronic pain in his back and other areas before the vaccination and had significant experience reporting symptoms and the severity of pain. Exhibit 14. When Mr. Hayward suffered injuries, he typically sought treatment within a few days, if not the following day, and would often seek treatment when he rated the pain as a 4 of 10, a level less than a severe level of pain. If Mr. Hayward were experiencing a severe left shoulder pain soon after the November 20, 2013 vaccination, he would have sought treatment before the December 23, 2013

6

chiropractic appointment. Moreover, if the left shoulder pain were severe enough to prevent him from continuing his contracting work (as he testified), there would be a stronger motivation for Mr. Hayward to seek medical treatment promptly. Considering Mr. Hayward's work records, the gaps in Mr. Hayward's work on his sister's house do not seem indicative of the inability to work because his pre-vaccination work records showed irregular work schedules and gaps. Since Mr. Hayward is self-employed, he does not have any regular schedule and did not present any evidence to indicate that the work on his sister's house was on a particular timeline or that there was an expectation for when the work was to be completed. At the December 23, 2013 appointment, Mr. Hayward did not report a severe dull aching left shoulder pain and the new pain he reported was related to an injury to his back and neck from shoveling. Exhibit 14 at 62. Mr. Hayward later recounted that his neck pain in December 2013 was the severe pain (8 or 9 of 10) and that his shoulder pain was mild (2 or 3 of 10). Exhibit 9 at 43. The first neurologist to see Mr. Hayward, Dr. Yarahmadi, even categorized his left shoulder pain in December 2013 as chronic rather than pain arising from an acute injury. Exhibit 2 at 60-61.

While Mr. Hayward disputes the accuracy of the onsets recorded in these medical records, he does not dispute other aspects of the medical records, does not explain why the medical records are inaccurate, and does not question the qualifications of the medical personnel producing the records. The medical records created relatively close in time to the vaccination support an onset of mild left shoulder pain around December 21, 2013. The medical records lend greater support to the onset of severe neck pain around December 21, 2013.

Mr. Hayward's testimonial account regarding the onset of severe left shoulder pain conflicts with these medical records. Mr. Hayward's affidavits and testimony, if accepted, would place the onset of severe left shoulder pain weakness around November 25, 2013. Although Mr. Hayward appeared to offer this testimony sincerely, the value of testimony about events occurring years earlier is diminished by the passage of time. As such, the oral testimony did not outweigh the medical records created closer in time to December 2013 and January 2014.

21. In regard to the onset of Mr. Hayward's left-hand weakness, medical records created in December 2013 and January 2014 are relatively consistent about the onset of left-hand weakness. These records include:

    a. At his first post-vaccination chiropractic appointment on December 23, 2013, Mr. Hayward did not complain of any hand weakness. Exhibit 14 at 62.
    b. At his next chiropractic appointment on December 26, 2013, Mr. Hayward first mentioned having no strength in his left hand. Exhibit 14 at 63.
    c. On December 31, 2013, Mr. Hayward reported to Dr. Dunlay that his hand weakness had begun ten day prior, and Dr. Dunlay urgently referred Mr. Hayward to a neurologist because of the "acute onset" of weakness. Exhibit 2 at 59.

7

    d. On the same day, Dr. Yarahmadi also recorded that Mr. Hayward's hand weakness had begun ten days earlier. Exhibit 2 at 60-61.
    e. On January 23, 2014, a physical therapist recorded that Mr. Hayward "had a month of hand weakness" and the onset/exacerbation date of his hand weakness was specified as December 20, 2013. Exhibit 3 at 218.
    f. Other medical records more generally placed the onset of left-hand weakness as "December 2013."

As noted above, while Mr. Hayward disputes the accuracy of the onsets recorded in these medical records, he does not dispute other aspects of the medical records, does not explain why the medical records are inaccurate, and does not question the qualifications of the medical personnel producing the records. A multiplicity of medical records created relatively close in time to the events in question point to an onset of left-hand weakness on December 21, 2013.

Mr. Hayward's testimonial account regarding the onset of left-hand weakness conflicts with these medical records. Mr. Hayward stated that the onset of left-hand weakness began within about one to two weeks after the November 20, 2013 vaccination. Exhibit 6 ¶ 8; exhibit 169 ¶ 33; Tr. 44.[3] This testimony, if accepted, would place the onset of left-hand weakness between November 27, 2013, and December 4, 2013. Although Mr. Hayward appear to offer this testimony sincerely, the value of testimony about events occurring years earlier is diminished by the passage of time. As such, the oral testimony did not outweigh the medical records created closer in time to December 2013 and January 2014.

    The parties must present this ruling to the doctors whom they have retained. Opinions based upon assumptions that are not consistent with this ruling will not be credited. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415 (Fed. Cir. 1993). A status conference to discuss the proposed next steps is scheduled, sua sponte, for **Friday, October 30, 2020, at 11:00 A.M. Eastern Tim**e.

Any questions may be directed to my law clerk, Andrew Schick, at (202) 357-6360.

**IT IS SO ORDERED.**

                                          s/Christian J. Moran
                                          Christian J. Moran
                                          Special Master

---

[3] Ms. Van Slyke did not present any testimony to anchor when Mr. Hayward first exhibited left-hand weakness.